J-S36033-20

2022 PA Super 16

COMMONWEALTH OF PENNSYLVANIA  :   IN THE SUPERIOR COURT OF
                                                      :                  PENNSYLVANIA
                                                      :
                        v.                            :
                                                      :
                                                      :
                                                      :
THADDEUS CRUMBLEY                          :
                                                      :
                Appellant                         :   No. 1899 WDA 2019

Appeal from the PCRA Order Entered December 13, 2019
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s):  CP-02-CR-0002820-2012

BEFORE:  OLSON, J., KING, J., and PELLEGRINI, J.[*]

OPINION BY PELLEGRINI, J.:                    **FILED: JANUARY 26, 2022**

On August 20, 2020, this Court affirmed the order of the Court of
Common Pleas of Allegheny County (PCRA court) denying Thaddeus
Crumbley's (Crumbley) petition for post-conviction relief.  ***See
Commonwealth v. Crumbley***, 1899 WDA 2019 (Pa. Super. August, 2020)
(unpublished memorandum).[1]  We had followed then-binding precedent which
compelled us to hold that Crumbley's claims concerning the ineffectiveness of
his PCRA counsel could not be addressed on the merits because they had been
raised for the first time on appeal.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] In Pennsylvania, the Post-Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541-
9546, is the "only method for obtaining collateral review." ***Commonwealth
v. Descardes***, 136 A.3d 493, 501 (Pa. 2016).

Subsequently, our Supreme Court granted further review, vacated our decision, and remanded the case for reconsideration in light of its own recent opinion in **Commonwealth v. Bradley**, 261 A.3d 381 (Pa. 2021).[2]  It held in that case that layered claims of ineffective PCRA counsel may now be raised for the first time on appeal if that is the earliest practical opportunity to do so. Upon reconsideration in light of **Bradley** and for the reasons that follow, we affirm the order of the PCRA court and hold that Crumbley is not entitled to post-conviction relief because none of his claims are meritorious.

## I.

In 2012, Crumbley and his co-defendant, Matthew Ebo, were found guilty of murder and several related offenses.  **See Commonwealth v. Crumbley**, 127 WDA 2016 (Pa. Super. June 21, 2017).  The Commonwealth's only eyewitness was Saday Robinson (Robinson), who testified that she saw Crumbley and Ebo shoot the victim, Todd Mattox.

Crumbley and Ebo were sentenced, each receiving life terms, and they filed direct appeals.  Prior to filing briefs, they sought a remand to the trial court for an evidentiary hearing based on after-discovered evidence, namely, Robinson's recantation of her identification in a letter dated November 12, 2014.  We granted the application and remanded the case to the trial court.

---

[2] **See Commonwealth v. Crumbley**, 333 WAL 2020 (Pa. November 4, 2021) (granting review, vacating and remanding for reconsideration and merits review of layered claims of PCRA counsel's ineffectiveness).

However, at the evidentiary hearing, Robinson withdrew her previous recantation, explaining that she gave it due to threats by Crumbley and Ebo's associates, and the trial court ruled that a new trial was not warranted. The direct appeal then resumed before this Court, and in 2017, Crumbley's judgment of sentence was affirmed,[3] becoming final on March 13, 2018.[4] We found no merit in any of Crumbley's direct appeal issues, including the claim that Robinson's recantation entitled him to a new trial.

Crumbley timely filed his first PCRA petition, *pro se*, and he was appointed PCRA counsel who submitted an amended version claiming that a new eyewitness to the Mattox murder had come forward.[5] This witness, Robert Raglin, submitted a signed statement dated July 31, 2018, describing

_____

[3] Ebo's convictions were also affirmed, but this Court ordered a resentencing to remedy violations of **Alleyne v. United States**, 570 U.S. 99 (2013). Crumbley's sentence was not affected.

[4] Crumbley filed a petition for allowance of appeal before the Pennsylvania Supreme Court, which was denied on December 13, 2017, and he did not seek relief before the United States Supreme Court. His judgment of sentence became final on March 13, 2018, when the 90-day period for seeking a writ of certiorari expired. Crumbley had one year from that date to timely file a PCRA petition, which he did, *pro se*, on February 13, 2018.

[5] Crumbley's PCRA counsel abandoned several of the claims Crumbley had asserted in his initial *pro se* petition, including Claims IV and VI, which became the basis of Crumbley's layered ineffectiveness claims in this PCRA appeal. Both issues – regarding improper prosecutorial comment and denial of a missing witness instruction – were found to be waived by trial counsel in Crumbley's direct appeal. **See Commonwealth v. Crumbley**, 127 WDA 2016 (Pa. Super. June 21, 2017) (unpublished memorandum).

what he saw. The PCRA court held a hearing to assess Raglin's credibility.
*See* PCRA Hearing, 5/10/2019, at pp. 44-46. After he testified, the PCRA
court made the following findings:

a. On May 16, 2011, the day Todd Mattox was shot to death at the Leechburg Gardens Apartments in Penn Hills, Mr. Raglin was working as a jitney driver.

b. That evening, shortly before the shooting occurred, Mr. Raglin picked up two (2) African American men and drove them to the Leechburg Gardens apartments. He claimed that he recognized these men because they had used his jitney services "more than ten" times in the past. He described one of the men as being "really tall" with "dark skin," approximately 6'8 in height. He described the other man as being "short" and "light-skinned."

c. When presented with photographs that were marked as Defense Exhibits A and B, he was able to identify the individuals in those pictures as the men he had driven to the Leechburg Gardens apartments that day. (He had nicknamed them "stretch" and "young buck" but recalled that they referred to each other as "Ron and Rome or something like that.")

d. Mr. Raglin testified that he dropped these men off at the Leechburg Gardens [apartments] at approximately 7:00 p.m., when it was getting dim outside.

e. After he dropped them off, Mr. Raglin testified to the following series of events:

I was turning my car around so I could go out. I had to go to the bathroom by the fire hydrant and the big Christmas tree. As I'm standing up peeing, a white car comes in [the parking lot], two guys started busting off caps, and everybody started shooting at each other. I dove on the ground, crawled in my car, dropped my seat back and pulled out.

f. Mr. Raglin testified that he "clearly" saw that "Ron and Rome" were firing their guns "[o]ver in that direction towards the parking lot in that area" where the white car was located.

g. However, he also testified that he "wasn't paying no attention" to what or who they were shooting at because he dropped to the ground as soon as he saw "the sparks and fires." As he described it: "I dropped down, peed on myself, crawled in my car, kicked my seat back and just pulled off. I started lifting my head up as I am pulling out."

h. After Mr. Raglin got back inside of his vehicle, he noticed that the white car had pulled out behind him, and he thought that the people inside of the white car were going after him because of what he had just witnessed.

i. Even though Mr. Raglin saw Ron and Rome shooting at the people in the white car, Mr. Raglin thought that Ron and Rome were now in the white car behind him. However, Mr. Raglin never saw anyone get in or out of the white car, and he could not see inside of the vehicle at any point. Mr. Raglin was able to retreat safely from the scene, but he never went to the police to report the shooting that he had allegedly witnessed, and, at that time, he was unaware that anyone had been killed in the shootout. Law enforcement also never attempted to contact him in 2011 about the shooting.

* * *

k. When asked why he decided to come forward with this information in 2018, Mr. Raglin testified as follows: I was in the [Allegheny] county jail, and I was on the fourth floor just coming in, and these gentlemen was talking and they was pointing at me. So they called me to be released. As I am coming downstairs to be released, some young guy told me - he was from Turtle Creek or something - he told me that I was there. And I said, "[w]here?" He says "you was there for the 'Leechburg, Penn Hills'] shooting." And he goes, "say that you wasn't, and jump on you." I'm like, what the hell? So I put my foot on the bunk and stood up to fight to defend myself.

l. Mr. Raglin testified that this young man was a fellow inmate whom he did not know and had never seen before. This unidentified inmate told Mr. Raglin that he knew Mr. Raglin was there that night because he was there too.

m. Mr. Raglin stated that the inmate provided the details of the incident, telling him "exactly where it happened, exactly what time

- 5 -

it was. [The inmate] said the guy's name that died." The inmate also told him that "these were the two men that did it."

n. Mr. Raglin testified that he was scared that this inmate was going to physically assault him. He "felt threatened enough . . . to jump on the bunk and brace" himself "for just two of them against me." The jail guards had to step in to prevent an altercation.

o. Mr. Raglin testified that he "didn't know any of this [information]" and that he was "in shock" because he was "being attacked" so he "had to do research on why" he was "being attacked."

p. Mr. Raglin testified that when he was released from jail shortly thereafter, he had a friend of his fact-checked [sic] the information that the inmate had provided on her cell phone because he wanted to know why he "was threatened for my life in jail." He asked his friend to google "the days, dates, things like that."

q. When he saw the pictures of [Crumbley and Ebo] and learned that they had been convicted of the murder, he "knew [they were not] the people that" he had driven to the complex. This prompted Mr. Raglin to write a letter to . . . Crumbley telling him "that I knew they were innocent because I was there."

r. Mr. Raglin testified that he decided to reach out to Mr. Crumbley because he had a brother in prison who he believes was wrongfully convicted, and he did not "want an innocent man to be in jail."

s. Mr. Raglin further testified that he does not know and has never seen any member of the Crumbley or Ebo family and that [Crumbley and Ebo] were not present during the shooting incident that he witnessed.

t. Mr. Raglin confirmed that the witness statements that were attached to the PCRA petitions were true. Though he claimed he saw "something in one line somewhere" when he was reading it that was a discrepancy, but he never scratched anything out or attempted to correct this purported discrepancy.

u. Mr. Raglin also testified that he did not attempt to contact law enforcement or the District Attorney's Office with the information he had relayed to . . . Crumbley through his letter.

v. When questioned by this court, Mr. Raglin clarified that he did not actually see anyone get struck by a bullet, he did not see what the victim looked like at any point, and he did not see anyone laying on the ground. He also testified that he never saw anyone get out of the white car before the shooting started and he did not see who entered the white car after the shooting because he "wasn't paying attention" and "everything happened in a tenth of a second."

Order and Opinion, 12/13/2019, at 5-11 (footnotes, headings and citations omitted).

The PCRA court denied Crumbley's after-discovered evidence claim on the grounds that Raglin's testimony would be used solely to impeach the credibility of the Commonwealth's eyewitness, Robinson, and that Raglin's account would be unlikely to compel a different verdict were a new trial granted. **Id**. at 11-17. Crumbley timely appealed and his PCRA counsel filed a 1925(b) statement raising issues limited to the after-discovered evidence claim.

In his appellate brief, Crumbley presents three grounds for our consideration:

i. Whether the PCRA court erred in denying Mr. Crumbley's after-discovered evidence claim by finding that Robert Raglin's testimony would be used solely to impeach Saday Robinson's testimony and finding that Mr. Crumbley did not suffer actual prejudice[;]

ii. Whether Mr. Crumbley was denied his federal and Pennsylvania constitutional due process right to effective assistance of PCRA counsel and his rule-based right to such assistance where PCRA

counsel failed to allege trial counsel's ineffectiveness for not objecting to the prosecutor's improper reference to Mr. Crumbley as an "angel of death" [and;]

iii. Whether Mr. Crumbley was denied his federal and Pennsylvania constitutional due process right to effective assistance of PCRA counsel and his rule-based right to such assistance where PCRA counsel was ineffective in failing to argue trial counsel's ineffectiveness in declining to preserve for review her request for a missing witness instruction when the Commonwealth did not present Richard Carpenter[.]

Appellant's Brief, at p. 9 (suggested answers omitted).

The Commonwealth responds in its brief that the PCRA court did not abuse its discretion in ruling that Crumbley failed to establish his after-discovered evidence claim. As to the latter two claims concerning Crumbley's claims of ineffective PCRA counsel, the Commonwealth contends that such issues cannot be raised for the first time on appeal, and that even if they could be considered, the claims lack merit.

After reviewing the record and the applicable law, we find that there is no basis to disturb the PCRA court's denial of Crumbley's after-discovered evidence claim.[6] As to Crumbley's two additional claims of ineffective assistance of PCRA counsel, we find that although the recent **Bradley** decision permits him to raise those issues for the first time on appeal, they are ultimately without merit and do not entitle him to post-conviction relief.

---

[6] In reviewing the denial of Crumbley's claims, we are limited to determining whether the PCRA court's findings are supported by the record and free of legal error. *See Commonwealth v. Allen*, 732 A.2d 582, 586 (Pa. 1999).

## II.

Crumbley's first issue concerns the PCRA court's denial of his after-discovered evidence claim. At an evidentiary hearing, Crumbley and his co-defendant presented the testimony of a new witness (Raglin), who testified that two other men had killed the victim.

After-discovered evidence is a recognized ground for relief under the PCRA. **See** 42 Pa.C.S. § 9543(a)(2)(vi). Relief is due when the proponent can "demonstrate that the evidence: (1) could not have been obtained prior to the conclusion of the trial by the exercise of reasonable diligence; (2) is not merely corroborative or cumulative; (3) will not be used solely to impeach the credibility of a witness; and (4) would likely result in a different verdict if a new trial were granted." **Commonwealth v. Pagan**, 950 A.2d 270, 292 (Pa. 2008). Failure to satisfy any one prong is fatal to the claim. **See Commonwealth v. Solano**, 129 A.3d 1156, 1180 (Pa. 2015) ("As this test is conjunctive, failure to establish one prong obviates the need to analyze the remaining ones.").

The PCRA court found that Crumbley had not satisfied the third and fourth prong of the above test. **See** PCRA Court Opinion, 12/13/2019, at 12-17. We disagree with the PCRA court that the third prong was not met, but affirm the denial of the claim based on Crumbley's failure to establish the fourth – that the result would have been different if a new trial were granted.

Approximately eight years after the Mattox murder occurred, Crumbley put forward the eyewitness account of Raglin, whose testimony conflicts with the Commonwealth's sole eyewitness at trial, Robinson. The PCRA court found that Raglin's testimony would be used solely to impeach the credibility of Robinson. *Id*. at 12-15 (citing *Commonwealth v. Weis*, 611 A.2d 1218, 1229 (Pa. Super. 1992) ("Whenever a party offers a witness to provide evidence that contradicts other evidence previously given by another witness it constitutes impeachment[.]")).

However, Crumbley had no other eyewitnesses at trial who had identified someone other than himself and the co-defendant as the perpetrators of the subject murder. Raglin's account, then, did not simply undercut Robinson's credibility or cast doubt on her identification; that was incidental. If believed, Raglin *also* directly established that someone other than Crumbley committed the murders. Since Raglin's testimony did more than impeach the credibility of another witness, the third prong is satisfied.

We now turn to the fourth prong of the claim – whether Raglin's testimony would have likely resulted in a different outcome if a new trial were granted. *See Pagan*, 950 A.2d at 292. "In making that determination, a court should consider the integrity of the alleged after-discovered evidence, the motive of those offering the evidence, and the overall strength of the evidence supporting the conviction." *Commonwealth v. Padillas,* 997 A.2d 356, 365 (Pa. Super. 2010). "[C]ases that have addressed [after-discovered

evidence] have focused not simply on the credibility of the person offering the exculpatory evidence, but on the credibility or trustworthiness of the evidence itself, as well as the motive, or other impeaching characteristics, of those offering it." *Id*. (quoting *Argyrou v. State*, 709 A.2d 1194, 1204 (Md. 1998)).

On review of a PCRA court's ruling, we must defer to its factual determinations, including those relating to the credibility of witnesses. *See Commonwealth v. Johnson*, 966 A.2d 523, 532 (Pa. 2009). The PCRA court's rulings must stand as long as they are supported by the record and free of legal error. *See id*.; *see also Commonwealth v. Mitchell*, 105 A.3d 1257, 1277 (Pa. 2014) (as finder of fact, a "PCRA court judge may believe all, some, or none of a particular witness's testimony.").

Here, on the one hand, the PCRA court found Robinson credible when she testified both at trial and at a PCRA hearing regarding her identification of Crumbley and post-trial recantation. The PCRA court emphasized that Robinson had described the incident in detail. Further, the PCRA court had assessed her demeanor firsthand, noting that she "shook uncontrollably throughout her testimony and was clearly frightened to be involved in the case." PCRA Court Opinion, 12/13/2019, at 15. The PCRA court credited Robinson's explanation that she earlier attempted to recant her trial testimony because she had been threatened into doing so indirectly by Crumbley and the co-defendant. *See id*. at 13.

On the other hand, the PCRA court found that Raglin lacked credibility based on his demeanor and the lack of detail in his account. While Raglin testified that Crumbley and Ebo were not the shooters, he also said that he did not see the victim in the car in which he was shot, and that once he heard gunfire, he dropped to the ground and stopped paying attention. *Id*.

In addition to the problems with the content of Raglin's testimony, the PCRA court was rightfully skeptical about the reasons why he had come forward. Raglin, who was in jail in 2018, testified that he was randomly prompted to give an exonerating statement in Crumbley's favor by an unnamed inmate who physically threatened him.

Nothing in Raglin's testimony or elsewhere in the record explains how, in 2018, this unnamed inmate could possibly know that Raglin saw the Mattox shooting in 2011; nor did Raglin explain why this inmate would have reason to threaten him due to his presence there. Up until then, it was unknown to the police, Crumbley and even Raglin himself that he had witnessed a fatal shooting. Raglin also did not know at the time he was threatened that Crumbley and Ebo had been found guilty of murdering Mattox. According to Raglin, he only learned the names of the victim and the accused after he was released from incarceration and had the chance to research the incident on the internet.

Based on the PCRA court's assessment of Raglin's testimony and the evidence against Crumbley, we find no abuse of discretion. The record

supports the PCRA court's finding that Raglin's account would have had minimal value as compared to the evidence of Crumbley's guilt. Robinson was found credible, and there are too many holes in Raglin's bizarre story for it to likely result in a different outcome were a new trial granted.

### III.

### A.

Next, Crumbley asserts that his PCRA counsel was ineffective for failing to raise two issues in his PCRA petition concerning trial counsel's deficient performance. Both of those underlying errors concerning trial counsel had been raised in Crumbley's direct appeal, and we declined to address their merits for lack of preservation and because the asserted grounds of ineffectiveness may only be raised at the post-conviction stage by way of a PCRA petition. *See generally Commonwealth v. Crumbley*, 127 WDA 2016 (Pa. Super. June 21, 2017).

The present case is in the post-conviction stage, but the subject ineffectiveness claims were not included in Crumbley's PCRA petition. Crumbley's PCRA counsel declined to raise these two issues due to the erroneous belief that they had already been fully litigated on the merits in Crumbley's direct appeal. Because the issues were, in fact, *not* fully litigated, resulting in a waiver of those claims, Crumbley now asserts in his PCRA appeal that his initial PCRA counsel was ineffective. Before reaching the merits of

these layered ineffectiveness claims,[7] we must determine whether they are properly raised for us to review at this juncture.

In Pennsylvania, the right to post-conviction relief is statutory or "rule-based" in nature, as codified in the PCRA and the Pennsylvania Rules of Criminal Procedure, which provide that "the judge shall appoint counsel to represent the defendant on the defendant's first petition for post-conviction collateral relief." Pa.R.Crim.P. 904(C).

The PCRA affords courts authority to consider the merits of post-conviction claims only so long as they comport with the PCRA's procedural requirements. PCRA claims are generally considered to be waived unless a petitioner first asserts them in a PCRA petition within one year from the date the judgment of sentence became final. *See* 42 Pa.C.S. § 9545(b). Otherwise, an exception to the PCRA's jurisdictional time-bar must apply. *See id*. at § 9545(b)(1)(i)-(iii). A party must also preserve issues for appeal by having them adjudicated at the earliest possible time and then listing them in a 1925(b) Statement. *See* Pa.R.A.P. 302(a), 1925(b)(4).

Ineffective assistance of counsel is a recognized basis for relief under the PCRA. A petitioner must establish by a preponderance of the evidence

---

[7] Crumbley's ineffectiveness claims as to PCRA counsel are derived from his underlying assertion that trial counsel performed deficiently and PCRA counsel should have raised such issues in the amended PCRA petition; accordingly, PCRA counsel could only be found ineffective if trial counsel was ineffective. *See Commonwealth v. Rykard*, 55 A.3d 1177, 1190 (Pa. Super. 2012).

that "the issue underlying the claim of ineffectiveness has arguable merit, that defense counsel's act or omission was not reasonably designed to advance the interests of the defendant, and that the defendant was prejudiced – that is, but for counsel's errors, the outcome of the proceeding would have been different." **Bradley**, 261 A.3d at 390 (citing **Commonwealth v. Pierce**, 786 A.2d 203, 213 (Pa. 2001)).  To show prejudice, a petitioner must demonstrate a "reasonable probability" of a better outcome.  **See generally Commonwealth v. Mallory**, 941 A.2d 686 (Pa. 2008).

Asserting a claim of ineffective PCRA counsel has long been an extremely difficult process.[8]  In almost all cases, the only viable way for a petitioner to do so was to assert the claim within 20 days of a PCRA court's Rule 907 notice of its intent to summarily deny a PCRA petition.  **See** Pa.R.Crim.P. 907; **see also Bradley**, 261 A.3d at 386-87.

However, in **Bradley**, our Supreme Court outlined several reasons why that process was a "largely impractical and ineffective" means of vindicating the long-recognized right to effective post-conviction counsel.  **Id**. at 399.

_____

[8] It is much easier to seek relief from PCRA counsel's *per se* ineffectiveness, such as conduct which results in a petitioner's complete loss of post-conviction rights.  **See e.g., Commonwealth v. Parrish** (Pa. 2020) (PCRA counsel deemed ineffective *per se* by failing to file a timely Rule 1925(b) statement and waiving client's right to appellate review of order denying his PCRA petition).

Accordingly, our Supreme Court broke from precedent and instituted a new procedure for asserting such claims:

> We reject the current Rule 907 procedure by which a petitioner may raise claims of ineffective assistance of PCRA counsel as unworkable, and offer a modified and flexible *. . .* approach allowing a petitioner to raise claims of ineffective PCRA counsel at the first opportunity, even if on appeal. We conclude this approach best recognizes a petitioner's right to effective PCRA counsel while advancing equally legitimate concerns that criminal matters be efficiently and timely concluded.

*Id*. at 405.

In the present case, Crumbley has raised his claims of ineffective PCRA counsel at the first practical opportunity, albeit on appeal from the denial of his PCRA petition. Under ***Bradley***, we may, therefore, consider those preserved claims on the merits.

**B.**

First, Crumbley contends that his PCRA counsel was ineffective in failing to allege trial counsel's ineffectiveness when the prosecutor referred to Crumbley in closing argument as an "angel of death." The ostensible purpose of this reference was to highlight the fear experienced by the critical eyewitness, Robinson, and thereby convince the jury that the witness was credible for having overcome that fear to testify at the trial:

> I want to talk to you first about Saday Robinson. Credibility and believability of a witness, you are the judges of the facts in this case, you are to determine the credibility. You listen to the young lady testify. You didn't just listen with your ears, you could watch her, especially if you were on this end of the jury box, she couldn't stop shaking the entire time. She is petrified. She said this is seared into her brain, she will never forget these faces. And why

- 16 -

would she say she saw the lighter skinned male, which is Ebo, and say he looked at me, we locked eyes, I had seen him before. **She wasn't afraid to say that and describe him, but the angel of the [sic] death over here, Thaddeus Crumbley, with his hoody up, that has what it takes to walk up to a man, stand over him and blow his brains out, she wasn't as hot on identifying.** She told the police, hey, come on in here, get in my apartment, I don't want people to see me, snitches get snitches [sic]. She doesn't want to be next.

Trial Transcript, 8/31/2012, at p. 1437 (emphasis added).

This language was indisputably improper and inflammatory, and there is no reasonable basis for counsel's decision not to object to it. The merit of the layered ineffectiveness claim, therefore, turns on whether the comment was prejudicial for the purposes of the PCRA, *i.e.*, whether Crumbley would have had a reasonable chance of a better outcome in the proceedings had his trial counsel made a timely objection. If so, then Crumbley's PCRA counsel would have to be found ineffective in failing to raise the issue in Crumbley's PCRA petition. ***See Commonwealth v. Burkett***, 5 A.3d 1260, 1270 (Pa. Super. 2010) ("In determining a layered claim of ineffectiveness, the critical inquiry is whether the first attorney that the [petitioner] asserts was ineffective did, in fact, render ineffective assistance of counsel.").

In a criminal trial, "the prosecutor must be free to argue that the facts of record establish every element of the crime charged, and must be free to respond fairly to the arguments of the defense." ***Commonwealth v. Clancy***, 192 A.3d 44, 65 (Pa. 2018). The bounds of "oratorical flair" afford the prosecution significant leeway in this regard, but "when statements

deteriorate into impermissible characterizations and inflammatory name-calling that are divorced from the record or irrelevant to the elements of the crime at issue, they are substantially unwarranted and must be scrutinized for prejudicial effect[.]" ***Id***.

To determine whether such a comment causes prejudice, courts must consider the totality of the evidence and the full context in which the comment was uttered. ***See id.***; ***Commonwealth v. Spotz***, 18 A.3d 244, 288 (Pa. 2011); ***see also Commonwealth v. Weiss***, 776 A.2d 958, 968 (Pa. 2001) ("[I]n order to evaluate whether the comments were improper, we do not look at the comments in a vacuum; rather we must look at them in the context in which they were made.").

An ineffectiveness claim based on counsel's failure to object to a prosecutor's comment has merit where it is demonstrated that the comment deprived the petitioner of a constitutional or statutory right, such as the rights to a fair trial and due process. ***See Commonwealth v. Tedford***, 960 A.2d 1, 28-29 (Pa. 2008). "Reversible error occurs only when the unavoidable effect of the . . . comments would prejudice the jurors and form in their minds a fixed bias and hostility toward the defendant such that the jurors could not weigh the evidence and render a true verdict." ***Commonwealth v. Cox***, 728 A.2d 923, 932 (Pa. 1999). "The touchstone is the fairness of the trial, not the culpability of the prosecutor." ***Tedford***, 960 A.2d at 28*.

Courts have "not hesitated to set aside personal prosecutorial assertions which lack a proper evidentiary foundation and which unjustly stigmatize the accused in the eyes of the jury." *Commonwealth v. Johnson*, 533 A.2d 994, 996 (Pa. 1987); *see also Commonwealth v. Anderson,* 415 A.2d 887 (Pa. 1980) (finding error where defendant was referred to as an "executioner" carrying out an "assassination"); *Commonwealth v. Gilman,* 368 A.2d 253, 255 (Pa. 1977) (finding error where prosecutor referred to defendant as "judge, jury, prosecutor, and ultimately executioner").

By the same token, courts have often declined to find reversible error where a prosecutor's comment was based on the evidence and did not have the unavoidable effect of preventing the jury from weighing the evidence objectively. *See Commonwealth v. Brown*, 711 A.2d 444, 456 (Pa. 1998) (finding that in the context of the entire trial of a gruesome murder, the evidence supported prosecutor's description of defendant as a "killer," "murderer," and "slayer"); *Commonwealth v. Johnson,* 668 A.2d 97, 106–07 (Pa. 1995) (finding no grounds for mistrial where prosecutor's description of defendants as "henchmen" was "based on the reasonable inferences drawn from the evidence"); *Commonwealth v. Jones,* 610 A.2d 931, 943 (Pa. 1992) (finding fair comment where description of defendants as "murdering, child-killing, backshooting" trio, "slaughterers," and executioners," was reasonably based on the evidence); *Commonwealth v. D'Amato*, 526 A.2d 300, 312 (Pa. 1987) (finding that prosecutor's reference to the defendant as

a "clever, calculating and cunning executioner" was permissible response to the defense's portrayal of defendant as being easily duped into making his confession).

In the present case, the prosecutor's "angel of death" comment is akin to remarks that would not warrant relief even in the event of a contemporaneous objection at trial. The Commonwealth attempted to prove Crumbley's guilt by relying on the testimony of an eyewitness, Robinson, whose credibility was a central point of contention. Although Robinson had reported to the police that she saw Crumbley murder the victim, she had also at one point recanted her accusation, explaining in her trial testimony that she had been threatened with violence if she took the stand. The certified record reflects that Robinson displayed visible signs of fear while she testified.

The jury's role was to assign weight to Robinson's testimony, and they were correctly instructed that part of that process was to gauge the demeanor of the witness. If Robinson was truly afraid of Crumbley, it would have tended to support her account that she witnessed the murder, that Crumbley committed the crime, and that she feared for her own safety as a result. Crumbley's appearance and demeanor at the time Robinson testified was very much relevant for the jury's assessment of Robinson's credibility.

By referring to Crumbley as an "angel of death," the prosecutor was not literally advising the jury to find Crumbley guilty because he was aligned with malevolent supernatural forces – this would have unjustly stigmatized

Crumbley and urged conviction based on facts not in evidence. *See Johnson*, 533 A.2d at 996. Rather, the prosecutor was using the imagery to demonstrate to the jury why Robinson seemed to be disturbed by Crumbley's hooded visage and why her fear arguably made her more credible despite her earlier recantation.

Since Robinson's testimony and Crumbley's physical appearance were in evidence before the jury, and their respective appearances and demeanors were relevant considerations, defense counsel could not have been ineffective in allowing the prosecutor's characterization and waiving a challenge to the prosecutor's comment for the purpose of appellate review. The comment could not have impeded the jury from weighing the evidence and rendering a true verdict, nor did it otherwise deprive Crumbley of the rights to due process and a fair trial. Had counsel timely objected, there is no reasonable probability that the outcome of the proceedings would have been different and, thus, as to the layered ineffectiveness claim concerning PCRA counsel, no relief is due.

**C.**

Crumbley's second layered ineffectiveness claim is that his PCRA counsel failed to raise trial counsel's ineffectiveness concerning the denial of a missing witness jury instruction. We find no merit in this claim.

At trial, the Commonwealth presented testimony from investigating detectives that Crumbley was initially arrested in connection with the Mattox murder based on the out-of-court identification of a jailhouse informant,

Richard Carpenter. Although the Commonwealth had served Carpenter with a subpoena to testify at Crumbley's trial, he did not appear and could not be located by either party. The trial court issued a bench warrant for Carpenter's arrest, but to no avail.

Carpenter's unavailability did not become established until after the trial had already begun. In fact, the Commonwealth discussed Carpenter's identification of Crumbley in its opening remarks to the jury and stated its intention to call him as a witness. Once it came to light that Carpenter's whereabouts were unknown and that he would not be testifying after all, defense counsel asked the trial court to instruct the jury that it could infer from the witness' absence that his testimony would have been favorable to Crumbley.[9]

The trial court denied the request, finding that it was not warranted because the Commonwealth had given a satisfactory explanation for failing to call him to the stand and the witness was equally available or unavailable to

_____

[9] The missing witness adverse inference rule provides that

> when a potential witness is available to only one of the parties to a trial, and it appears that the witness has special information material to the issues at trial, and the witness's testimony would not merely be cumulative, if such party does not produce the testimony of this witness, the jury may draw an inference that the witness's testimony would have been unfavorable to the party having control of the witness.

*Commonwealth v. Boyle*, 733 A.2d 633, 638 (Pa. Super. 1999).

Crumbley and the Commonwealth. Although Crumbley's trial counsel received an adverse ruling as to the request for an instruction, and included the issue in a post-trial motion, the issue was nevertheless waived for purposes of direct appeal because counsel had not made a contemporaneous objection. **See Commonwealth v. Crumbley**, 127 WDA 2016 at *11 (Pa. Super. June 21, 2017) (unpublished memorandum) (finding issue waived on direct appeal for lack of preservation); **see also Commonwealth v. Pressley**, 887 A.2d 220, 224 (Pa. 2005) (holding that "[t]he pertinent rules [of Criminal Procedure] … require a specific objection to the charge or an exception to the trial court's ruling on a proposed point to preserve an issue involving a jury instruction").

A missing witness instruction is appropriate where the "witness is available to only one of the parties to a trial, and it appears this witness has special information material to the issue, and this person's testimony would not merely be cumulative[.]" **Commonwealth v. Evans**, 664 A.2d 570, 573 (Pa. Super. 1995). Where the party does not present the witness, the jury may be instructed that it can infer that the testimony of the witness "would have been unfavorable." **Id**.

However, a trial court may decline to issue this instruction if the uncalled witness is equally available to both parties, not within the control of the party against whom a negative inference is sought, or there is a satisfactory explanation as to why the party failed to call the witness. **See Evans**, 664 A.2d at 573-74.

In this case, Crumbley asserts that as to the merit of the underlying claim, the trial court erred in denying a missing witness instruction once it became clear that Carpenter would not be available to testify. Crumbley emphasizes that Carpenter was part of a witness protection program, putting him in the exclusive control of the Commonwealth and making him available only to that party.

However, the record contains no evidence that Carpenter was participating in a witness protection program by the time the trial had begun on August 28, 2012. The record reflects, rather, that Carpenter's participation in witness protection had ceased months earlier, and that the Commonwealth had no record of his location from that point on. *See* Pretrial Discovery Hearing, 7/27/2012, at pp. 30-32.

The equal unavailability of the witness to both Crumbley and the Commonwealth was a proper basis for the denial of a missing witness instruction. Trial counsel, therefore, could not have been ineffective in failing to object to the ruling, and the layered claim of PCRA counsel's ineffectiveness has no merit. *See Burkett*, 5 A.3d at 1270 ("If [trial counsel] was effective, then subsequent counsel cannot be deemed ineffective for failing to raise the underlying issue.").

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>1/26/2022</u>